**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**February 28, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

CITIZENS FOR PEACE IN SPACE,
an unincorporated association;
WILLIAM SULZMAN; MARY LYNN
SHEETZ; BARBARA HUBER;
GERARD JACOBITZ; DONNA
JOHNSON; APRIL PERGL,

      Plaintiffs - Appellants,

v.

THE CITY OF COLORADO
SPRINGS, Colorado, a Colorado
municipal corporation,

      Defendant - Appellee.

No. 05-1391

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 04-CV-464-RPM)**

---

Mark Silverstein, American Civil Liberties Union Foundation of Colorado, (and
Edward T. Ramey, Isaacson, Rosenbaum, P.C., on the brief), Denver, Colorado,
for Plaintiffs - Appellants.

Thomas J. Marrese, Assistant City Attorney, (and Patricia K. Kelly, City
Attorney/Chief Legal Officer, Office of the City Attorney, on the brief), Colorado
Springs, Colorado, for Defendant - Appellee.

---

Before **KELLY**, **EBEL**, and **GORSUCH**, Circuit Judges.

**KELLY**, Circuit Judge.

Plaintiffs-Appellants Citizens for Peace in Space and several of its members (Citizens) appeal from the district court's judgment in favor of Defendant-Appellee The City of Colorado Springs (the City). The Citizens sought nominal damages under 42 U.S.C. § 1983 for an alleged violation of First Amendment rights. Specifically, the Citizens alleged that, from October 7 to October 10, 2003, they were unconstitutionally prohibited from protesting in the traditional public forums surrounding the Broadmoor Hotel (Broadmoor) in Colorado Springs, Colorado. After a three-day bench trial, the district court issued a memorandum opinion and order in favor of the City. Citizens for Peace in Space v. City of Colorado Springs, No. 04-CV-464-RPM, 2005 WL 1769230 (D. Colo. July 25, 2005). We exercise jurisdiction over the resulting judgment pursuant to 28 U.S.C. § 1291 and affirm.

Background

From October 7 through October 10, 2003, the Secretary of Defense hosted a conference of the defense ministers of nineteen member nations of NATO,[1] plus nine invitee nations, at the Broadmoor Hotel in Colorado Springs. Approximately

---

[1] NATO is the popular acronym for the North Atlantic Treaty Organization, an alliance of twenty-six countries from North America and Europe formed to fulfill the goals of the North Atlantic Treaty signed on April 4, 1949.

1,000 delegates, family and staff attended the conference. The Department of Defense leased the entire Broadmoor facility for the conference, including the International Conference Center, which is located across the street.

The security plan for the conference included closing public streets and sidewalks and imposing a large "limited access area" or "security zone." This security zone surrounded the Broadmoor and extended across public and private property for several blocks in all directions. The perimeter was roughly defined by five checkpoints at roadway intersections surrounding the Broadmoor property. The security zone was completely closed to all persons except conference attendees, accredited media, Broadmoor employees, individuals residing in the security zone, guests of individuals residing in the security zone, and personnel servicing the Broadmoor and the residences within the security zone.

The security plan resulted from the work of a task force that operated pursuant to an international memorandum of agreement. The task force based its planning on worldwide NATO protocols. The task force included officials from the Air Force, the Army, the Colorado Springs Police Department (CSPD), the El Paso County Sheriff's Department, the FBI, the Department of Justice, the Department of Transportation, the Department of Homeland Security, FEMA, and NATO. The task force's primary security concern was the threat of a terrorist attack utilizing explosives. The task force envisioned that such an attack might involve explosives driven onto the Broadmoor grounds by vehicle and detonated

or explosives carried by an individual onto the grounds and detonated. Accordingly, the breadth of the security zone ensured that the blast from any such detonation would not get close enough to the Broadmoor to endanger any of the delegates.

During the conference, several hundred personnel from the military and various law enforcement agencies, including the CSPD, staffed the security zone. Five checkpoints, placed at various intersections around the Broadmoor, exclusively controlled access to the security zone. Security at the checkpoints included screenings by metal detectors and explosive-sniffing dogs. Broadmoor employees were bused into the zone from an off-site staging area, where, like airline passengers, they were pre-screened by metal detectors and scanners. Delegates, and their families and staffs, arrived and departed the conference by motorcade. Several hundred members of the national and international media were allowed into the security zone, as well. Like the Broadmoor employees, members of the media were pre-screened at an off-site staging area (the World Arena) and bused into the Broadmoor. Once inside the security zone, members of the media were restricted to an area around the International Conference Center, across the street from the Broadmoor's main building. The Broadmoor employees, conference delegates, and media all entered the security zone through Checkpoint 1 at the intersection of Lake Avenue and Second Street.

Protocols were also established allowing delivery and repair persons

- 4 -

servicing the hotel to enter the security zone at Checkpoint 1. Likewise, protocols allowed the residents of twenty-two private homes located within the security zone to enter as they pleased; any time, day or night. Furthermore, delivery and repair persons servicing the private residences were allowed to enter and leave the security zone, as well as social guests of the residents living in the twenty-two homes, all of them passing through security at Checkpoint 1.

The Citizens are residents of Colorado Springs and long-time peace activists. Their principal concern is with the militarization of space and the prevention of war. Upon learning that the NATO conference would be held at the Broadmoor, the Citizens consulted with the American Civil Liberties Union (ACLU) and authorized it to communicate with the City on their behalf to see if they could be allowed to conduct a peaceful protest within the security zone. Specifically, the Citizens hoped to conduct their protest on a sidewalk across from the International Conference Center. An ACLU attorney communicated the Citizens' wishes to the City and explained that the proposed protest would involve six persons who would hold banners on a sidewalk across the street from the International Conference Center. The Citizens proposed a peaceful vigil that would be limited to one hour. They further offered to submit to the same security checks and screenings required of other persons allowed into the security zone.

The City rejected the request, contending that allowing the Citizens' protest would require it to permit other groups to do the same, which would jeopardize

- 5 -

the government's ability to maintain security for the conference.  Instead, the City suggested that the Citizens conduct their protest outside the security zone, near Checkpoint 1.  The Citizens found this location unsatisfactory because the conference delegates and international media, the Citizens' target audience, could only observe the protest briefly as their vehicles passed by.

Nevertheless, the Citizens did conduct their protest at Checkpoint 1, standing by the side of the road (there were no sidewalks).  This location was several blocks from the International Conference Center.[2]  There was no direct line of sight between the protest location and the International Conference Center, and the Citizens could barely be seen, if at all, from the Broadmoor itself.  When the Citizens requested that CSPD officers inform the conference delegates and international media of their protest at Checkpoint 1, the officers declined.

The Citizens contend that even if the international media were alerted to the existence of their protest, security protocols prohibited them from walking down Lake Avenue to interview the Citizens.  Instead, the Citizens contend that members of the international media would have had to leave the International Conference Center by bus, return to their off-site staging area, and then arrange

---

[2]  Although the record is not entirely clear, it appears that Checkpoint 1 was approximately 310 yards from the front of the International Conference Center. See http://www.gmap-pedometer.com (last visited January 23, 2007).  We take judicial notice of this distance.  See Fed. R. Evid. 201(b),(c); see also Pearson v. United States, 150 F.2d 219, 221 (10th Cir. 1945) (taking judicial notice of distance); Nascone v. Spudnuts, Inc., 735 F.2d 763, 773 (3d Cir. 1984) (same).

private transportation to the protest site. In fact, while conducting their protest, the Citizens did not have any close, physical interaction with any of the conference delegates or international media.

At trial the City introduced evidence that, based on staffing levels incorporated into the security plan, officers would have been unable to control protests that turned confrontational or unlawful. The staffing levels included, at a minimum, sixty-five members of the CSPD. The CSPD officials testified that generally allowing protestors into the security zone would have required doubling the number of CSPD officers assigned to the conference. CSPD officials stated that any protest, peaceful or otherwise, would require officer observation and escort.

CSPD officials, however, conceded that there were sufficient officers to observe and supervise the Citizens' proposed six-person vigil. The district court expressly found "[t]here were adequate personnel available to assure the peacefulness of a one-hour demonstration and the prevention of any disruption to the NATO conference." Citizens for Peace in Space, 2005 WL 1769230, at *4. The City argued, however, that allowing the Citizens into the restricted zone would lead other groups to make similar requests. CSPD officials conceded the City could have handled similar requests, under protocols similar to those suggested by the Citizens, for groups limited to a small size.

## Discussion

In a First Amendment case, we have "an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 499 (1984) (internal citations omitted). Thus, we review the district court's findings of fact and its conclusions of law de novo. Revo v. Disciplinary Bd. of the Supreme Court, 106 F.3d 929, 932 (10th Cir. 1997). We conduct our review "without deference to the trial court." Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, 515 U.S. 557, 567 (1995); see also New York Times Co. v. Sullivan, 376 U.S. 254, 285 (1964).

The public streets and sidewalks encompassed by the security zone are traditional public forums. See Hill v. Colorado, 530 U.S. 703, 715 (2000) (noting that "public sidewalks, streets, and ways . . . are quintessential public forums"); see also United States v. Grace, 461 U.S. 171, 177 (1983). The government may impose reasonable time, place, and manner restrictions on speech in public forums provided the restrictions are (1) content neutral, (2) that they are "narrowly tailored to serve a significant governmental interest," and (3) that they "leave open ample alternative channels for communication." Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989).

I.    Application of The Time, Place, and Manner Factors

   A.    Content Neutrality

The Citizens concede that the City's restriction is content neutral. Although this concession is not controlling given our special standard of de novo review, we see no reason to disagree. There is no evidence that the City's security plan drew any distinction based on the content of speech. Instead, it implemented a total ban on public expression within the security zone, regardless of the identity of the speaker or the subject of the message. See Menotti v. City of Seattle, 409 F.3d 1113, 1129 (9th Cir. 2005). Accordingly, we hold that the City's security plan was content neutral.

   B.    Significant Government Interest

The Citizens similarly concede that the City's interest in security is significant. The Citizens, however, take issue with the nature of the exact security interest asserted by the City, arguing that the City's only asserted interest was in keeping vehicle-borne explosives away from the conference. A review of the record indicates that the City was concerned with the threat of terrorism generally, including the use of vehicle and human-borne explosives, and with the threat posed by disorderly and violent protestors. See II Aplt. App. at 476:11-24, 518:8-18, 554:16-22; III Aplt. App. at 629:14-19, 644:8-16, 669:1-11, 678:11-20, 679:8-21, 695:8-18. As discussed below, the City's security interest is of the highest order and guides our determination of whether the security plan was

narrowly tailored and whether there were ample alternative channels of communication.

C.    Narrow Tailoring

In this case, the City's security plan was narrowly tailored to advance its significant security interest because the security zone, limited to the immediate vicinity of the Broadmoor, directly and effectively protected the conference from the threat of terrorism, explosives, and violent protests. As discussed below, the Citizens' arguments to the contrary are premised on a narrow security interest and an overly strict standard of the relationship between the security zone and the security interest. This appears tantamount to an attempt to impose de facto strict scrutiny review of the City's security plan, a standard that does not apply to time, place, and manner restrictions.

"Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." Ward, 491 U.S. at 799. Thus, in order to demonstrate that a challenged restriction is narrowly tailored, the government must demonstrate that the restriction "serve[s] a substantial state interest in a direct and effective way." Edenfield v. Fane, 507 U.S. 761, 773 (1993) (internal quotations omitted). Absent such proof, a restriction "may not be sustained if it provides only ineffective or remote support for the government's purpose." Id. at 770 (quoting Central Hudson Gas

- 10 -

& Elec. Corp. v. Pub. Serv. Comm'n, 447 U.S. 557, 564 (1980)).[3]  Thus, a

regulation is not narrowly tailored when it "does not sufficiently serve those

public interests that are urged as its justification."  Grace, 461 U.S. at 181.

In this case, the burden falls on the City to show that its "recited harms are

real . . . and that the regulation will in fact alleviate these harms in a direct and

material way."  Turner Broad. Sys. Inc. v. FCC, 512 U.S. 622, 664 (1994).  It is

not enough that the City justify its restrictions based broadly on "security."  See

Bl(a)ck Tea Soc'y v. City of Boston, 378 F.3d 8, 13 (1st Cir. 2004) (noting that

"the question of narrow tailoring must be decided against the backdrop of the

harms that a particular set of security measures are designed to forfend").  This

does not mean, however, that the City must show that its restriction is the least

intrusive means of promoting its interest.  See Ward, 491 U.S. at 798-99.

Instead, we will give deference to a reasonable judgment by the City as to the best

means of providing security at the NATO conference.  See id. at 800 ("The

validity of time, place, or manner regulations does not turn on a judge's

agreement with the responsible decisionmaker concerning the most appropriate

method for promoting significant government interests. . . .").

In this case, the City asserts that a wide security zone was necessary

---

[3]  The validity of time, place, and manner restrictions is determined under a
standard essentially identical to that governing the regulation of commercial
speech.  See United States v. Edge Broad. Co., 509 U.S. 418, 430 (1993).
Accordingly, we draw on relevant precedent from some commercial speech cases.

because of the need to keep the conference outside the blast radius of any explosion that might have been caused by vehicle or human-borne explosives. The City also asserts, that given that so many defense leaders were gathered in one location, it needed an extra margin for error. In other words, it needed a deep security zone so that its officers would have more reaction time to fend off any terrorist or other threat before the conference delegates were placed in imminent danger. Furthermore, the exclusion of protestors from the security zone allowed the City to devote its officers to maintaining the perimeter and fending off any possible terrorist attacks, rather than having its officers monitor protestors, which would have required the City to staff twice as many officers at the conference. I Aplt. App. at 91-92, 98.

The nature of the NATO conference bears not only on the conceded "significant interest" component of the time, place, and manner analysis, but also on the "narrowly tailored" component. While an extremely important government interest does not dictate the result in time, place, and manner cases, the significance of the government interest bears an inverse relationship to the rigor of the narrowly tailored analysis. See Bd. of Trus. v. Fox, 492 U.S. 469, 480 (1989) (noting that there must be a fit between the government's means and its desired objective–"a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served") (emphasis added).

In this case, there can be no doubt that the City's interest in providing security to a gathering of defense officials is of the highest order. We also cannot ignore the fact that the City's chosen method of providing security was part of a security protocol that was created by Department of Defense officials, NATO personnel, and various international defense agencies. Courts have historically given special deference to other branches in matters relating to foreign affairs, international relations, and national security; even when constitutional rights are invoked by a plaintiff. See, e.g., INS v. Abudu, 485 U.S. 94, 110 (1988) (international relations); CIA v. Sims, 471 U.S. 159, 178-79 (1985) (national security); O Centro Espirita Beneficente Uniao do Vegetal v. Ashcroft, 389 F.3d 973, 1025 (10th Cir. 2004) (en banc) (McConnell, J., concurring) (international relations).[4]

Despite the importance of the City's interest, and the obvious conclusion that the security zone certainly advanced the City's interest in securing the conference, the Citizens advance a number of arguments to show that the security

---

[4] We note that some recent decisions have limited the extent of such deference, e.g., Hamdan v. Rumseld, 126 S. Ct. 2749 (2006), and the Supreme Court appeared hesitant (although it never reached the question) to grant such deference in a multi-opinion case involving the First Amendment, see Boos v. Barry, 485 U.S. 312, 324 (1988) ("Thus, the fact that an interest is recognized in international law does not automatically render that interest compelling . . . .") (internal quotations omitted). Nevertheless, it would be inappropriate to ignore the fact that the City's ability to provide effective security had national and international ramifications.

zone was not narrowly tailored. While the City undoubtedly bears the burden of demonstrating narrow tailoring, and it has done so in this case, we think our discussion will be most clear by addressing each of the Citizens' arguments. Those arguments can be summarized as:

(1) The total exclusion of pedestrian demonstrators did not directly and effectively advance the City's security interest in protecting against explosives and any argument to the contrary is undermined by the fact that the City allowed numerous other classes of persons into the security zone.

(2) The City failed to demonstrate that it could not have accommodated protestors by simply increasing the number of officers present in the security zone.

(3) The City burdened substantially more speech than was necessary to further its interest. The presence of other, obvious less restrictive security protocols, including a permit system, demonstrates the security zone was not narrowly tailored.

We reject the Citizens' arguments and discuss them in turn.

1. The Direct and Effective Relationship Between the Security Zone and the City's Significant Interest

The Citizens characterize the security zone as indirectly connected to the City's security interest and thus impermissible. See Edenfield, 507 U.S. at 773 (stating that the regulations must serve a substantial state interest in "a direct and effective way"). The Citizens argue that the security interest put forth by the City was the need to keep vehicle-borne explosives away from the Broadmoor, and that the security zone had nothing to do with any harms or threatened harms that the City attributed to pedestrians. Aplt. Br. at 29 ("In light of the absence of

- 14 -

evidence that the Plaintiffs or other protestors posed a direct threat to safety, the City relies on an indirect and much more tenuous connection between its restrictions and its interest in protecting the conference participants."). As noted earlier, the City's security interest included the prevention of "possible terrorist threats and/or violent demonstrations," including the detonation of vehicle or human-borne explosives. Aplee. Br. at 5.

The City asserts that, absent the total ban on protestors, security would have been achieved "less effectively." Aplee. Br. at 20-21 (citing Ward, 491 U.S. at 782-83 ("[N]arrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation . . . .")). The City also argues that the Citizens' literal adherence to the word "direct," as used in Edenfield, essentially transforms the narrowly tailored analysis into least restrictive means analysis.

The narrowly tailored analysis proceeds from the specific security interest articulated by the City. See Grace, 461 U.S. at 181; Bl(a)ck Tea Soc'y, 378 F.3d at 13. Indeed, to assess whether a restriction is an appropriate "fit" to some important government interest, it is necessary that the government interest be specifically defined. Otherwise, the narrowly tailored analysis more closely resembles the "reasonably necessary" standard used in reviewing restrictions on speech in areas that are not public forums. See, e.g., Brown v. Glines, 444 U.S. 348, 355 (1980). In this case, that interest is the need to protect the conference

- 15 -

delegates from terrorist threats and violent demonstrations, including the detonation of vehicle or human-borne explosives

Contrary to the Citizens' argument, however, courts have not insisted upon a literal showing that but for the restriction, the substantial governmental interest would not be served. Instead, the regulation of speech has been deemed to directly advance the government's interest "[s]o long as the means chosen are not substantially broader than necessary." Ward, 491 U.S. at 800. Here, the security zone directly advanced the City's interest in keeping explosives away from the NATO conference because it limited access near the Broadmoor to identified and screened individuals who were less likely to pose any threat to the delegates. Furthermore, a strict no-access policy allowed the City to devote its officers to maintenance of the extensive security zone perimeter and to the innumerable other security tasks associated with a conference of such magnitude. Had the City allowed protests within the security zone, its officers would have faced the substantial, additional burdens of screening protestors upon entry, maintaining supervision of the protestors during their protest, and generally providing enough manpower in close proximity to the protestors to quickly handle any protest that turned violent.

The Citizens argue that the City failed to prove that other protest groups would have requested permission to protest inside the security zone, and it contends that the City was wrong to premise its denial of the Citizens' request out

of concern that a host of other groups would seek similar treatment. The Citizens describe this concern as "hypothetical." It goes without saying, however, that security protocols exist to deal with hypothetical risks. It was appropriate for the City to consider, as part of its decision to deny the Citizens' specific request to protest, the effect that additional protests would have on its ability to provide security at the conference.

2.    Additional Officers

The Citizens also argue that the City could have supplied additional officers to monitor and escort the protestors and that, as a result, a total ban on expression was unnecessary. Specifically, they argue that the City failed to show "it would have been unable to assign more officers, or impose additional overtime, or arrange for reinforcements from another law enforcement agency." Aplt. Br. at 30. But the Citizen's argument assumes a standard far more strict than that at play here. The City is not obliged to show, under the narrowly tailored analysis, that it was impossible to increase officer presence to accommodate the protestors. This is a burden akin to that required in strict scrutiny cases. Instead, the City need only show that the security zone was a reasonable fit to the security interest. See U.S. West, Inc. v. FCC, 182 F.3d 1224, 1239 (10th Cir. 1999). The fact that more officers might have been available is, in and of itself, irrelevant, unless it shows that the City's security plan was not a reasonable fit to the asserted security interest.

Furthermore, the Citizens argue that officer staffing levels at the Broadmoor were adequate to assure the peacefulness of their demonstration and others like it. Aplt. App. at 31. However, this argument assumes the best-case scenario: that all protest groups would be peaceful and law-abiding. The City was not required to base its security protocol on such an assumption, and indeed would have been foolish to do so. Additionally, the Citizens provide no authority that the narrowly tailored analysis can proceed based on this rosy scenario. Instead, security planning is necessarily concerned with managing potential risks, which sometimes necessitates consideration of the worst-case scenario. As long as a designed security protocol reduces a plausible and substantial safety risk, it directly and effectively advances a substantial government interest.

3.      A Burden on Substantially More Speech Than Necessary

The Citizens argue that the security zone burdened substantially more speech than necessary because it even restricted residents, who were allowed within the zone, from protesting on sidewalks in front of their homes. Aplt. Br. at 34-35. This argument does not address, however, the City's concern that it would, as a matter of prudence, have to devote officers to supervising protestors, no matter whether the protestors were residents or outsiders, and no matter how well known or peaceful they seemed to be. It was not impermissible for the City to draw a distinction between residents going about their daily business in the security zone and those seeking to protest the NATO conference, because the City

- 18 -

made a reasonable assumption that protestors could pose more of a security risk to the conference than other persons, an assumption that, for example, finds some support given the violent protests surrounding the World Trade Organization meeting in Seattle, Washington. See Menotti, 409 F.3d at 1120-23.

Additionally, the Citizens argue that the City could have chosen a number of obvious, less restrictive alternatives to the security zone's total ban on protests. Specifically, the Citizens suggest that the City could have set up a permit-based system allowing small groups of protestors into the security zone for limited times, and they argue that the City's failure to do so indicates the security zone was not carefully calculated to consider the burdens on expression. Aplt. Br. at 39-40. The Citizens also argue that the City never even contemplated allowing any protestors into the security zone.

Based on our holding in U.S.West, they argue that such alternatives indicate a lack of narrow tailoring. We note, however, that the presence of such alternatives is not dispositive. First, the cases cited by U.S. West for this notion only invalidated speech regulations that were "substantially excessive, disregarding far less restrictive and more precise means." 182 F.3d at 1238 (citing Fox, 492 U.S. at 479). Second, Lederman v. United States, 291 F.3d 36 (D.C. Cir. 2002), a case chiefly relied upon by the Citizens in their discussion of obvious, less restrictive alternatives, involved a per se ban on expression to promote safety and the orderly flow of traffic. Id. at 45. Though traffic control is

- 19 -

important, the safety and security of NATO defense officials would seem to be a paramount concern. Given this interest, a more generous "fit" analysis may be warranted than that used in Lederman.

Additionally, the alternatives suggested by the Citizens are not really "obvious" within the meaning of that term as contemplated in U.S. West. First, enacting a permitting scheme would have been quite complex and still would have required the City to provide officers to escort and monitor the protestors, which would have hindered its ability to provide security for the conference. Though we agree that some content-neutral permitting system could have been enacted, we do not agree with the Citizens that such a system is an obvious alternative that easily could have been utilized without diverting resources and personnel. The City had no idea how many protest groups would seek access to the security zone, and, again, it would have been forced to plan for the worst-case scenario. Second, the subjective failure of City officials to consider allowing protests is irrelevant to the objective time, place, and manner analysis. See Ward, 491 U.S. at 799 ("[T]he requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.") (internal quotations omitted). Regardless, even if the Citizens could articulate an obvious, less burdensome alternative, that is merely one factor that bears on the "fit" analysis. See U.S. West, 182 F.3d at 1238 n.11. Given the need to provide security and the catastrophic risk involved, we hold that the

security zone implemented by the City was narrowly tailored.

D.    Ample Alternative Channels

The Citizens also argue that they were denied ample alternative channels of communication because they were unable to interact with their intended audience; namely, the conference delegates and the international media. We conclude, however, that the Citizens were sufficiently able to communicate their message even though they had no close, physical interaction with their intended audience. "[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. 640, 647 (1981). However, an alternative mode of communication may be constitutionally inadequate if the speaker's ability to "communicate effectively is threatened." Members of City Council v. Taxpayers for Vincent, 466 U.S. 789, 812 (1984). As the Ninth Circuit has noted "the Supreme Court generally will not strike down a governmental action . . . unless the government enactment will foreclose an entire medium of public expression across the landscape of a particular community or setting." Menotti, 409 F.3d at 1138.

The Citizens correctly note that many courts have struck down security zones that push protestors far away from their intended audience. See, e.g., United States v. Baugh, 187 F.3d 1037, 1044 (9th Cir. 1999) (150-175 yard security zone with a "First Amendment area"); Bay Area Peace Navy v. United

- 21 -

States, 914 F.2d 1224, 1229 (9th Cir. 1990) (75 yard security zone preventing water-borne protests); Serv. Employee Int'l Union v. City of Los Angeles, 114 F. Supp. 2d 966, 972 (C.D. Cal. 2000) (260 yard security zone at the Democratic National Convention). They argue that, in this case, the security zone's breadth necessarily pushed protestors so far away from the conference delegates and international media that there could be no ample alternative channels of communication.

The City responds that all the conference delegates and international media viewed the Citizens when their motorcades and buses entered the security zone at Checkpoint 1. The City also notes, correctly, that on October 7 and 8, the Citizens were interviewed by local media as they protested at the checkpoint. The security zone, while prohibiting movement of the international media within it, did nothing to prevent the international media (or the conference delegates for that matter) from visiting the protestors outside the security zone.

The ample alternative channels analysis cannot be conducted in an objective vacuum, but instead it must give "practical recognition" to the facts giving rise to the restriction on speech. See Menotti, 409 F.3d at 1140. Thus, we must ask whether, given the particular security threat posed, the geography of the area regulated, and the type of speech desired, there were ample alternative channels of communication. To treat the ample alternative channels analysis as wholly independent disconnects it from reality and diminishes the emphasis

courts have traditionally placed on the importance of the government interest. See U.S. West, 182 F.3d at 1238.

Thus, in this case, given the City's need to maintain a strict perimeter and provide conference security, we must determine whether the alternative protest sight at Checkpoint 1 was an adequate alternative. While allowing the Citizens to protest outside Checkpoint 1 may not have been the best alternative, nor even the most prudent, it is "ample" in the context of the NATO conference and the overall security protocol. This is not a case where the Citizens were wholly deprived of their ability to communicate effectively. Both conference delegates and the international media viewed their protest at Checkpoint 1. They were interviewed by local media on October 7 and 8. They could have protested at the off-site staging area for the international media, but they declined. Simply put, the Citizens do not have a right to convey their message in any manner they prefer. Instead, they have a right to convey their message in a manner that is constitutionally adequate. See Menotti, 409 F.3d at 1140. In this case, protesting on the periphery of the security zone allowed the Citizens to present their views to the conference delegates and international media. They were not wholly cut off from their intended audience, such that there were no ample alternatives to a protest within the security zone itself.

AFFIRMED.