BRISCOE, Circuit Judge, dissenting.
I respectfully dissent. In my view, Sandy City has not carried its burden to establish that the Ordinance is narrowly tailored to serve a significant governmental interest. Nor has Sandy City established that the affected medians are nonpublic fora. I would reverse the district court's grant of summary judgment to the City and remand for further proceedings.
I
As the majority acknowledges, when a regulation is content neutral,[1] "the requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation, and does not burden substantially more speech than is necessary to further *1184 the government's legitimate interests." Wells v. City & Cty. of Denver, 257 F.3d 1132, 1148 (10th Cir. 2001) (quotations and ellipsis omitted). Here, the City has failed to show that the Ordinance does not burden substantially more speech[2] than is necessary to further the City's legitimate interest in public safety.[3]
A
To determine whether the Ordinance is narrowly tailored, we first look, as the majority did, to the amount of speech it burdens. See Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton, 536 U.S. 150, 165, 122 S.Ct. 2080, 153 L.Ed.2d 205 (2002) ("We must ... look ... to the amount of speech covered by the ordinance and whether there is an appropriate balance between the affected speech and the [state] interests that the ordinance purports to serve."). Contrary to the majority's view, I would conclude that the Ordinance places a substantial burden on speech.
The Ordinance bans all speech on affected medians at all times. See Sandy City Traffic Code, Article 16, Section 299.1. The Ordinance also applies to a substantial number of Sandy City's medians. Although the record does not include the exact number of affected medians, the record indicates that this number is significant, as it contains "over 100 pages of photographs depicting nearly every different type" of affected median. Aplt. Reply at 4; accord Aplee. App., Vol. II at 109-276. Because the Ordinance prohibits all expressive activity at all times on many medians throughout Sandy City, it "serious[ly] burdens ... speech." McCullen v. Coakley, 573 U.S. 464, 487, 134 S.Ct. 2518, 189 L.Ed.2d 502 (2014).[4]
B
In conducting the narrowly tailored analysis, we must look to "the specific ... interest articulated by the City." Citizens for Peace in Space v. City of Colo. Springs, 477 F.3d 1212, 1223 (10th Cir. 2007). "Indeed, to assess whether a restriction is an *1185 appropriate 'fit' to some important government interest, it is necessary that the government interest be specifically defined." Id. Here, the City enacted the Ordinance because it was "worried about people falling into traffic." Aplt. App., Vol. II at 291. When addressing the City Council in support of the Ordinance, Sandy City Police Chief O'Neal described the safety danger as follows: "If someone trips and steps out into traffic, especially with the speed that traffic goes through [one specific] area, it could be devastating." Aplt. App., Vol. I at 177. The First Amendment analysis must therefore examine the fit between the City's stated interest, preventing people from falling off medians into traffic, and the City's chosen means, banning all sitting or standing on all unpaved medians and all paved medians narrower than 36 inches.
C
After identifying the specific interest the City articulates, we must determine if the Ordinance is narrowly tailored to serve that interest; that is, if the Ordinance "burden[s] substantially more speech than is necessary to further the [City's] legitimate interests." Ward v. Rock Against Racism, 491 U.S. 781, 799, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). "[R]estrictions on the time, place, or manner of protected speech are not invalid simply because there is some imaginable alternative that might be less burdensome on speech." Id. at 797, 109 S.Ct. 2746. Rather, "[t]he scope of the restriction on speech must be reasonably, though it need not be perfectly, targeted to address the harm intended to be regulated." 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 529, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996) (O'Connor, J., concurring).
When deciding on the scope of the Ordinance, Sandy City Police Captain Justin Chapman and Sandy City Prosecutor Doug Johnson visited medians in Sandy City to determine which were "safe" and which were "unsafe." See Aplt. App., Vol. II at 292-93. The majority characterizes Chapman's and Johnson's process as a "survey of the medians in Sandy City." Maj. Op. at 1181; accord id. at 1178. I find that description generous, to say the least.
Johnson concluded which medians were "safe" based on whether, while standing on a median, he felt he was likely to be hit by a moving vehicle. Johnson made this determination "anecdotally," Aplt. App., Vol. II at 293, employing the following methodology:
I would just stand on a median and go, "This is scary. I just almost got hit." And then I would walk somewhere where it was just a little bit wider and go, "This is scary. I almost got hit." And then I would walk somewhere that was just a little bit wider, until finally I found a place where I said, "I don't think I could get hit there." And ... then I noted that place, went back to the police department, asked them to go get measurements for where I was standing, and went from there.
Id. Johnson conducted this experiment on one median in Sandy City.
Chapman visited "[a] lot" of medians throughout Sandy City and measured the width of medians throughout "the main arteries [of Sandy City] that ... had obvious islands." Id. at 357-58. Chapman "didn't feel any of the islands regardless [of width] were safe to be on." Id. at 359. After visiting the medians, Chapman concluded that the "not smooth," "unpaved medians" had "landscaping that would cause a tripping hazard." Id. This conclusion was based on his
feeling, if you had a person that was walking, standing, whatever they're doing in the area where cars are whizzing by, if it's unpaved, or uneven ..., you have the potential to trip on something like that .... That seemed it could be a *1186 little bit more unsafe because whether or not you're specifically choosing a path one way or another, you simply catch your toe on a rock and boom, you're in the traffic.
Id. at 359-60.
In addition to relying on Johnson's and Chapman's opinions, the City justifies the Ordinance by pointing to complaints that the Sandy City police received about people on medians.[5] The record contains twenty-nine documented complaints between October 7, 2014, and April 29, 2017, twenty-eight of which relate to people standing on Sandy City medians.[6] Most of the complaints arise from one small area of the city. Indeed, at least twenty-two of the twenty-nine complaints relate to locations within half a mile of each other, all of which are near on- and off-ramps for Interstate Highway 15. Based on Johnson's and Chapman's surveys and the complaints regarding people in the median, Sandy City enacted the Ordinance, which states in full:
It shall be illegal for any individual to sit or stand, in or on any unpaved median, or any median of less than 36 inches for any period of time.
Sandy City Traffic Code, Article 16, Section 299.1.
I view this record as inadequate to support the City's ban of all expressive activities in numerous medians throughout the city. First, Johnson and Chapman articulate no objective basis for their opinions. Rather, Johnson characterized his determination of which medians were safe as being made "anecdotally," Aplt. App., Vol. II at 293, and Chapman relied on his "feeling" to determine which medians "seemed [they] could be a little bit more unsafe," id. at 359-60.[7] In the First Amendment context, this is not enough. See Turner Broad. Sys., Inc. v. FCC, 520 U.S. 180, 196, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997) ("[I]n the realm of First Amendment questions," the legislature "must base its conclusions upon substantial evidence."); see also McCullen, 573 U.S. at 496, 134 S.Ct. 2518 ("Given the vital First Amendment interests at stake, it is not enough for [the City] simply to say" that the Ordinance is necessary.).
Second, the complaints the City submitted do not indicate that the Ordinance is tailored to address the City's articulated interest in preventing people from falling off medians into traffic. Even to the extent the complaints support a conclusion that sitting or standing on medians is in fact dangerous,[8] most of the complaints pertain *1187 to one small part of the city. As the Supreme Court noted in McCullen, "[f]or a problem shown to arise only once a week in one city at one clinic, creating 35-foot buffer zones at every clinic across the Commonwealth is hardly a narrowly tailored solution." 573 U.S. at 493, 134 S.Ct. 2518. Here, the complaints indicate a problem that arises infrequently and in a single area of Sandy City.[9] The City's decision in this case to ban all sitting or standing on many medians throughout the city is, as in McCullen, "hardly a narrowly tailored solution." Id.
Further, the record does not reveal the characteristics of the medians involved in the complaints-whether the medians are narrower than 36 inches, wider than 36 inches, paved, or unpaved. In other words, the record does not show whether the Ordinance in fact addresses any problem the complaints identified. So we are unable to determine whether the problem the City identified from the complaints-the potential for people to fall off medians into traffic-would actually be addressed by the Ordinance's prohibitions. Absent such evidence of tailoring-of a relationship between the end and the means-the Ordinance fails. See, e.g., McCutcheon v. Fed. Election Comm'n, 572 U.S. 185, 218, 134 S.Ct. 1434, 188 L.Ed.2d 468 (2014) ("In the First Amendment context, fit matters.").
As drafted, the Ordinance burdens a substantial amount of speech. And Sandy City has failed to show that the Ordinance does not "burden substantially more speech than is necessary to further" its interest in preventing people from falling off medians into traffic. Ward, 491 U.S. at 799, 109 S.Ct. 2746. Given the amount of speech it burdens, the interest the City identified to justify that burden, and the lack of fit between the two, the Ordinance is not narrowly tailored and does not survive intermediate scrutiny.
D
The Ordinance also fails intermediate scrutiny because the City has not shown that "alternative measures that burden substantially less speech would fail to achieve [its] interests." McCullen, 573 U.S. at 495, 134 S.Ct. 2518. The majority avoids analyzing the availability of alternative measures by stating that "we do not even reach the question of whether 'the government's interest could be adequately served by some less-speech-restrictive alternative' if the Ordinance is not 'substantially broader than necessary' to promote the City's interest in public safety." Maj. Op. at 1182 (quoting Ward, 491 U.S. at 800, 109 S.Ct. 2746 ). But the majority cites to no authority for this statement which, indeed, has no support in the law.[10] As we have explicitly stated, "[t]he Supreme Court has not discouraged courts from considering alternative approaches to achieving the government's goals when determining whether a content-neutral regulation is narrowly tailored to advance a significant government interest."
*1188 Verlo v. Martinez (Verlo I ), 820 F.3d 1113, 1135 (10th Cir. 2016). And the Supreme Court itself has looked to the government's other options for addressing the stated interest to determine whether a challenged regulation is substantially broader than necessary and thereby violates the First Amendment.
In McCullen, the Supreme Court's entire narrow-tailoring analysis consisted of discussing alternative measures the government could have utilized to further its substantial interests. See 573 U.S. at 490-96, 134 S.Ct. 2518. The Supreme Court first articulated the government's stated interest, then identified other regulations already in existence "that prohibit[ ] much of [the targeted] conduct," id. at 491, 134 S. Ct. 2518, and alternative regulations the government could enact that would prohibit the targeted conduct, id. at 491-93, 134 S. Ct. 2518. The Court did not-as the majority here suggests a First Amendment analysis must-first conclude that the challenged regulation was substantially broader than necessary, and then evaluate the availability of less speech-restrictive alternatives. Rather, the Court concluded that the challenged regulation was substantially more broad than necessary because of the availability of less speech-restrictive alternatives. Id. at 490-94, 134 S. Ct. 2518 ; accord Verlo I, 820 F.3d at 1135 ("[W]hen considering content-neutral regulations, the [Supreme] Court itself has examined possible alternative approaches to achieving the [state's] objective to determine whether the [state's] chosen approach burdens substantially more speech than necessary.").
And in this case, there are numerous alternative measures Sandy City could have employed to address the risks associated with people falling off medians into traffic. For example, Sandy City "might have considered limiting activity on medians only at night, when the dark makes it more difficult for drivers to see." Cutting v. City of Portland, 802 F.3d 79, 92 (1st Cir. 2015). Sandy City also could have examined "pedestrian and vehicle traffic patterns" and limited the Ordinance to certain times of day when traffic is busiest or to certain areas where the speed limit is greatest. Id. at 88. Sandy City did not consider such limitations.
In addition to narrowing the Ordinance by time of day or pedestrian and vehicle traffic, Sandy City could have applied the Ordinance only to those medians which were the focus of the complaints the City received. See Aplee. App., Vol. II at 277-341. As discussed, most of the medians that were the subject of citizen complaints were within half a mile of each other and were near on- and off-ramps for Interstate Highway 15. The City could have limited the Ordinance to medians in areas that had the most potential for safety problems.
Sandy City also could have used already-existing laws to ensure public safety. As in Cutting, the Sandy City citizen complaints showed that much of the "danger to drivers and other users of the streets ... was tied to concerns about disruptive and inattentive individuals on median strips." 802 F.3d at 90. Specifically, citizens complained that panhandlers "appeared to be intoxicated or high" or "were having trouble walking[ and] keeping their balance." Aplt. App., Vol. II at 357. This behavior could "be addressed through existing local ordinances," McCullen, 573 U.S. at 492, 134 S.Ct. 2518, including Sandy City's statutes against public intoxication and impeding traffic. Additionally, some medians can only be illegally accessed by jaywalking. By enforcing its laws prohibiting jaywalking, the City could reduce access to medians without burdening speech.
"The point is not that [Sandy City] must enact all or even any of the proposed [alternative approaches]. The point is instead that [the City] has available to it a *1189 variety of approaches that appear capable of serving its interests, without excluding individuals from areas historically open for speech and debate." McCullen, 573 U.S. at 493-94, 134 S.Ct. 2518. The Ordinance is not unconstitutional merely "because there is some imaginable alternative that might be less burdensome on speech." Ward, 491 U.S. at 797, 109 S.Ct. 2746. But, "[g]iven the vital First Amendment interests at stake, it is not enough for" Sandy City "to simply say that other approaches" would not work. McCullen, 573 U.S. at 496, 134 S.Ct. 2518. Rather, the City must "show[ ] that it seriously undertook to address the problem with less intrusive tools readily available to it," id. at 494, 134 S. Ct. 2518, 2531, and that these or other "alternative measures that burden substantially less speech would fail to achieve" its interests, id. at 495, 134 S. Ct. 2518, 2531. Sandy City has done neither, and that failure proves that the Ordinance is not narrowly tailored to achieve the City's interests.
E
In sum, the evidence the City relies on to show the requisite First Amendment means-end fit-the testimony of Johnson and Chapman that they did not feel safe on certain medians and the twenty-eight complaints about individuals in medians-is inadequate to support the City's decision to ban sitting or standing on all unpaved medians and all paved medians narrower than 36 inches throughout the entire city. And Sandy City has not shown that it attempted to address its safety concerns through other, less speech-restrictive alternatives. The City has not demonstrated that the Ordinance does not "burden substantially more speech than is necessary to further the government's legitimate interests," Ward, 491 U.S. at 799, 109 S.Ct. 2746, nor has it shown that "alternative measures that burden substantially less speech would fail to achieve [its] interests," McCullen, 573 U.S. at 495, 134 S.Ct. 2518. The Ordinance fails intermediate scrutiny.
II
Because I do not think the Ordinance survives intermediate scrutiny, I cannot merely assume, as the majority does, that the affected medians are traditional public fora. But I do not think that the City has established as a matter of law that the affected medians are nonpublic fora.[11] I would therefore reverse the district court's grant of summary judgment to the City and remand.
We distinguish between traditional public, designated public, and nonpublic fora by looking at: (1) physical characteristics of the property, including location, see Frisby v. Schultz, 487 U.S. 474, 480-81, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988) ; (2) intended use of the property, see United States v. Kokinda, 497 U.S. 720, 727, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990) ; and (3) actual use of the property, see Ark. Educ. Telev. Comm'n v. Forbes, 523 U.S. 666, 676, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1988). "[F]orum status is a fact-intensive inquiry," that "should be focused on the physical characteristics and the intended *1190 and actual use[s] of" the property. Verlo I, 820 F.3d at 1132, 1139.
As to the physical characteristics of the medians, the record has photos of "nearly every different type" of affected median. Aplt. Reply at 4. The photos reveal that, physically, the affected medians vary widely. For example, some contain park benches, memorial plaques, and signs readable only from close proximity, while others consist only of a narrow strip of concrete, likely only a few inches in length. Some medians are landscaped and accessible from crosswalks, while others are not.
As regards their intended uses, Sandy City claims "the sole purpose of the unsafe medians is to regulate automobile traffic, divide lanes, and prevent automobiles from crossing the centerlane in ways that would interrupt traffic flow." Aplee. Br. at 11. This may, in fact, be the City's intended use of the affected medians. But we have acknowledged that the government's intended use does not control the forum analysis. See First Unitarian Church of Salt Lake City v. Salt Lake City Corp., 308 F.3d 1114, 1124-26 (10th Cir. 2002) ("We first reject the contention that the City's express intention not to create a public forum controls our analysis. The government cannot simply declare the First Amendment status of property regardless of its nature and its public use."). Further, the physical characteristics of some medians undercut the City's stated intent. For example, if some medians are park-like and have benches, "memorial trees," or "memorial plaques," those features might indicate that some of the affected medians are in fact intended for pedestrian use, including sitting or standing. Satawa v. Macomb Cty. Road Comm'n, 689 F.3d 506, 522 (6th Cir. 2012) ("[T]he record refutes the Board's contention that, because Mound Road is a high-volume roadway, the Board does not want people on the median. If this were so, it would be strange to provide access to the median via sidewalk, and to allow various groups to erect benches, a gazebo, and plaques that could only be read while standing on the median."). The City's own statement that the affected medians are "largely accessible only by jaywalking," Aplee. Br. at 11 (emphasis added), implies that at least some medians are accessible via crosswalk, which may also indicate that those medians are intended for standing or sitting. See Satawa, 689 F.3d at 520 ("The median, moreover, invites visitors. It contains park benches and is accessible by sidewalk.").
Finally, regarding their actual uses, the record contains evidence that several medians have been used for protected speech activities. And the record indicates that Evans has used medians in Sandy City for speech activities on numerous occasions, both before and after the City enacted the Ordinance. The record therefore indicates that at least some of the affected medians have historically been used as public fora.
Because the record contains evidence that could support the conclusion that the affected medians are public fora, Sandy City has not established as a matter of law that the affected medians are nonpublic fora.
III
On the record presented, I would conclude that the Ordinance does not withstand intermediate scrutiny. Further, Sandy City has not established as a matter of law that the medians are nonpublic fora. I would reverse the district court's grant of summary judgment to the City and remand for further proceedings.
I respectfully dissent.

I agree with the majority that the Ordinance is content neutral.

The majority assumes that panhandling is protected speech, and I would affirmatively conclude that it is. As the majority notes, the Supreme Court has stated that "the solicitation of charitable contributions is protected speech." Maj. Op. at 1176 (quoting Riley v. Nat'l Fed'n of the Blind, 487 U.S. 781, 789, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988) ); see also Village of Schaumburg v. Citizens for a Better Env't, 444 U.S. 620, 632, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980) ("[C]haritable appeals for funds, on the street or door to door, involve a variety of speech interests-communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes-that are within the protection of the First Amendment."). And every one of our sister circuits to reach the question has concluded that panhandling is protected speech. See Reynolds v. Middleton, 779 F.3d 222, 225 (4th Cir. 2015) ; Speet v. Schuette, 726 F.3d 867, 870 (6th Cir. 2013) ; Smith v. City of Fort Lauderdale, 177 F.3d 954, 956 (11th Cir. 1999) ; Loper v. N.Y.C. Police Dep't, 999 F.2d 699, 704 (2d Cir. 1993) ; accord Comite de Jornaleros v. City of Redondo Beach, 657 F.3d 936, 945 (9th Cir. 2011) (en banc) (holding that solicitation is protected speech).

I also agree with the majority that the City's interest in public safety is legitimate and substantial.

The majority evaluates the Ordinance's burden on speech only with reference to whether the Ordinance renders Evans's panhandling less effective. To be sure, much of Evans's argument regarding the Ordinance's burden on speech focuses on the decreased efficacy of his speech because he is prohibited from using many medians to panhandle. But Evans's narrow-tailoring argument also argues that the Ordinance applies to numerous medians throughout the City. See Aplt. Br. at 32 ("Given that the City's evidence supported a conclusion that there were, at most, a few problem areas in Sandy, the City needed to try using less restrictive tools before it implemented a city-wide ban.").

Although the City cites complaints as evidence that the Ordinance was necessary, the majority does not rely on the complaints at all, stating only that the First Amendment "does not require the government to wait for accidents to justify safety regulations." Maj. Op. at 1182. Be that as it may, the First Amendment does require the government to "demonstrate that the recited harms," here, the danger of people falling off medians into traffic, "are real, not merely conjectural, and that the regulation will in fact alleviate those harms in a direct and material way." Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 664, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (plurality opinion).

One complaint does not seem related to an individual standing on a median at all. See Aplee. App., Vol. II at 303 ("[M]ale in traffic ... on foot ... in and out of traffic.").

The 36-inch width limitation did not stem from Chapman's opinions regarding safety. Rather, Chapman "didn't feel any of the islands regardless [of width] were safe to be on." Aplt. App., Vol. II at 359. Chapman's "years of experience dealing with unsafe situations involving pedestrians on medians in Sandy City," Maj. Op. at 1181, therefore did not inform the Ordinance's width limitation.

Several of the complaints were regarding the mere presence of individuals on medians and expressed no traffic-safety concerns. See, e.g., Aplee. App., Vol. II at 287 ("[T]ransient standing on the median asking for money for his infection."); id. at 312 ("Panhandler on the island stopping traffic and asking for money."); id. at 324 (indicating that a "panhandler" is in the "middle of [the] road"); id. at 333 ("Panhandler on the median ... getting mad when being refused" and "spit on [the] comp[lainant's] truck.").

The record indicates that the twenty-nine complaints in the record could be underinclusive. Regardless, Chapman-who testified that he personally fielded complaints that may not have been documented-stated that "[m]ost of" the complaints related to medians "at intersections" and involved the main roads and places with freeway access. Aplt. App., Vol. II at 353.

Even Sandy City does not argue that the court need not evaluate the availability of alternative measures in conducting its narrowly tailored analysis.

Sandy City argues that "Evans has not provided any evidence that the unsafe medians at issue here are public forums." Aplee. Br. at 10. That argument misplaces the burden. "[W]hen a law infringes on the exercise of First Amendment rights," as the Ordinance does, "its proponent," here, Sandy City, "bears the burden of establishing its constitutionality." iMatter Utah v. Njord, 774 F.3d 1258, 1263 (10th Cir. 2014) (quotation omitted). Thus, the burden was not on Evans to show the affected medians are public fora subject to intermediate scrutiny, but on Sandy City to show either that the medians are nonpublic fora and the Ordinance survives rational basis review, or the Ordinance survives intermediate scrutiny.