RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 12a0236p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

JOHN SATAWA,

        *Plaintiff-Appellant,*

       *v.*

MACOMB COUNTY ROAD COMMISSION; FRAN
GILLETT, individually and in her official
capacity as Chairperson, Macomb County
Road Commission; ROBERT HOEPFNER,
individually and in his official capacity as
Chairperson, Macomb County Road
Commission,

        *Defendants-Appellees.*

No. 11-1612

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:09-cv-14190—Gerald E. Rosen, Chief District Judge.

Argued: May 30, 2012

Decided and Filed: August 1, 2012

Before: BOGGS and COLE, Circuit Judges; and OLIVER, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Robert Joseph Muise, AMERICAN FREEDOM LAW CENTER, Ann
Arbor, Michigan, for Appellant. Benjamin J. Aloia, ALOIA & ASSOCIATES, P.C.,
Mount Clemens, Michigan, for Appellees. **ON BRIEF:** Robert Joseph Muise,
THOMAS MORE LAW CENTER, Ann Arbor, Michigan, for Appellant. Benjamin J.
Aloia, ALOIA & ASSOCIATES, P.C., Mount Clemens, Michigan, for Appellees.
Steven W. Fitschen, THE NATIONAL LEGAL FOUNDATION, Virginia Beach,
Virginia, for Amicus Curiae.

---

[*] The Honorable Solomon Oliver, Jr., Chief United States District Judge for the Northern District
of Ohio, sitting by designation.

———————————

**OPINION**

———————————

BOGGS, Circuit Judge.   The Macomb County Road Commission faced a dilemma.   The Freedom From Religion Foundation, an organization dedicated to "protect[ing] the fundamental constitutional principle of separation of church and state," had written a letter objecting to a private citizen's placing a crèche on a sixty-foot-wide median at Christmas time, as the citizen and his family had done for more than sixty years.   The county immediately ordered the crèche removed.   In response, the Thomas More Law Center, an organization dedicated to "restor[ing] and defend[ing] America's Judeo-Christian heritage," took up the citizen's cause and applied for a formal permit to display the crèche.   After seeking legal advice, the county denied the permit because, it stated, the crèche "clearly displays a religious message, [and thus displaying it on the median] would be a violation of the Establishment Clause of the First Amendment."   The citizen filed suit, claiming that denial of the permit violated his free-speech rights, the Establishment Clause, and his equal-protection rights.   During litigation, the county changed its explanation for denying the citizen's permit, claiming that safety, not the crèche's religious connotation, was—and had always been—the reason for its decision.   Relying on this explanation, the district court granted summary judgment for the county.   For the reasons outlined below, we affirm the district court's grant of summary judgment on Satawa's Establishment Clause claim, but reverse on all other grounds.

I

In 1945, Frank Krause and Joseph Satawa built a manger to house a set of statutes donated to St. Anne's Parish in Warren, Michigan.   The statues depicted the birth of Jesus Christ.  With the Village's permission, Krause and Satawa put the manger, with the statues inside, on a public median at the intersection of Mound Road and Chicago Road.[1]   They did so each year until their deaths in the late 1940s and 1965,

———————————

[1]The manger and figures, together, are called a nativity scene, or crèche.

respectively. Joseph Satawa's son and son-in-law, John Satawa[2] and Lawrence Green, continued this practice, assembling the crèche in the same place every year at Christmas time.[3]   They asked for, and received, permission from Warren officials to build the display in the late 1970s, 1994, and 1995. Satawa and Green have not sought permission since 1995, however, because a City of Warren police officer "inform[ed] [Satawa] that the [police] department was well aware of the nativity scene tradition and its presence on the median in Warren and that it was not necessary to send any letters in the future."

The median that houses the crèche separates four lanes of northbound traffic from four lanes of southbound traffic on Mound Road.[4]   It is sixty feet wide, and landscaped with grass, trees, and flowers. The Board of County Road Commissioners of Macomb County ("the Board")  has jurisdiction over the median because Mound Road is a Macomb County road.[5]   The site of the crèche itself is just south of Mound Road's intersection with Chicago Road, a two-lane, east-west street with a thirty-mile-per-hour speed limit. Traffic lights regulate the intersection from every direction.

The crèche is nine-and-one-half feet tall, eight feet wide, and eight feet deep.[6] It has front and back windows, and is illuminated at night. On the crèche is a sign that reads: "A Blessed Christmas, St. Anne Parish," and inside there is a plaque, with the words: "In Memory of Joseph and Rose Satawa." The crèche sits immediately north of a stand of pine trees, which is twenty-nine feet, four inches wide and fifteen feet tall. Behind the pine trees are two park benches, and at least one commemorative plaque, discernable only from the median. Also on the same section of median as the crèche are

---

[2]From this point forward, all references to "Satawa" are to John Satawa.

[3]The only year since 1945 that the crèche has not appeared in the median is 1996, when significant road construction made it impossible to erect the display.

[4]The speed limit on Mound Road is 50 MPH, and more than 82,600 cars use the road each day.

[5]The Board comprises three members: a Chairperson, a Vice-Chairperson, and a Commissioner. It has "responsibility for overseeing the Road Commission's budget and establishing and carrying out policies with regard to all matters pertaining to the County roads."

[6]As the district court explained, the crèche is only eight feet tall, but it sits on an eighteen-inch-high platform.

several pieces of old farm equipment and wagons, installed by the "Friends of the Village," a citizens' group dedicated to maintaining Warren's "village" character. Across Chicago Road to the north of the crèche is a gazebo and small courtyard, built by the Village of Warren Historical Commission, and a historical marker, again with text readable only from the median, put in place by the State of Michigan.

On December 10, 2008, the Board received, by fax, a letter from the Freedom From Religion Foundation. The letter, supposedly written on behalf of "a concerned Macomb County resident," argued that the crèche violated the Establishment Clause because "[d]isplaying an inherently Christian message at a busy intersection on County-owned property unmistakably sends the message that Macomb County endorses the religious beliefs embodied in the display." Accordingly, the Freedom From Religion Foundation "ask[ed] that [the Board] immediately . . . remove the display to private property."

In response, Macomb County Highway Engineer Robert Hoepfner dispatched Road Commission Permit Inspector Joe Dana. Dana reported back and told Hoepfner that, indeed, the crèche was where the Freedom From Religion Foundation said it was, and that Satawa's phone number was on a plaque attached to the display. Hoepfner called Satawa and explained that, because Satawa did not have a permit, Satawa would have to disassemble the crèche. A formal, written demand to remove the crèche within thirty days followed on December 11, 2008. Satawa complied after the end of the holiday season.

One month later, Satawa went to the Road Commission's office to apply for a permit to display the crèche the following year. Road Commission staff helped him fill out an application. On February 7, 2009, however, the Road Commission returned the application to Satawa, explaining that it was incomplete, and enclosing a new application. With help from the Thomas More Law Center, Satawa filled out the application, explaining in detail—and illustrating with photographs—the crèche's location. In his application, Satawa offered to pay all electrical costs associated with the display, to buy insurance, and "to post a sign at the display which states clearly that it

is his private display and not the display of Macomb County, the City of Warren, or any other government entity."

Hoepfner personally reviewed Satawa's application. He sought legal advice from an attorney for the county and brought the issue of Satawa's permit application to the Board's attention during the "new business" portion of a regularly scheduled meeting on March 9, 2009. There, he explained:

> MALE SPEAKER: This is an interesting one, last year a gentleman for the last 60 years has been installing a nativity scene at Mound Road and Chicago Road in the median of Mound Road, I received a letter from some anti-nativity scene law firm asking me to get rid of it.
> MALE SPEAKER: (Inaudible) Wisconsin?
> MALE SPEAKER: Yeah.
> MALE SPEAKER: Yeah.
> MALE SPEAKER: So I wrote the man a letter and ordered him to remove the nativity scene from the right-of-way. He has come in now and applied for a permit to install the nativity scene next year. His cover letter is from a law firm, the Thomas More Law Center. I've contacted Ben Aloia and asked him to research it. Ben has informed me that we should not allow this nativity scene to be installed, and he has given me some language that I should [sic] respond to this permit. I intend to do that. This probably won't go away and I suspect they'll sue us.
> FEMALE SPEAKER: All we can do is obey the law.[7]

This was the only time that the Board formally discussed Satawa's permit application.

Although Hoepfner mentioned only the crèche's religious aspects when he brought Satawa's application to the Board's attention, he claimed in his deposition, thirteen months later, that the primary reason for denying Satawa a permit was that the crèche raised a safety concern. In particular, he claimed to be worried that a vehicle might strike the crèche. Hoepfner made clear: "I didn't deny [the permit] for sight problems. It was an encroachment within the right of way . . . that's the reason I denied it."

---

[7]The district court noted that this transcript was likely inadmissible at the time of summary-judgment briefing because it had not been properly authenticated. It reasoned, however, that it could consider the transcript, on the assumption that the parties would reduce it to admissible form at trial.

Hoepfner also insisted in his deposition that he had separate discussions with each of the Road Commissioners about Satawa's application, outside of the Board's regularly scheduled meetings. ("Q: Did you ever have any discussions with any Board member outside of the Board meetings regarding the nativity scene permit? A: All of the Board Members."). These discussions, he claimed, lasted "many, many hours," and focused on his belief that the crèche posed a traffic hazard. The district court apparently took this testimony at face value.

It is true that Board Chairwoman Fran Gillett testified that she understood that Hoepfner was concerned about safety. However, she also indicated that she "first became aware of [the crèche] . . . when [the Board] had a complaint the Christmas before last [December 2008], and then at that point [she] *didn't hear anything more until 2009* at [the March 6 Board] meeting." (emphasis added). And yet, she claimed that she learned of Hoepfner's safety concerns through casual, passing discussions in the hallway. It is not likely that these discussions took place after the meeting, since Hoepfner responded to Satawa's permit application in writing the next business day after the Board meeting, March 9, 2009.[8] At best, then, Hoepfner and Gillet's testimony is confusing. At worst, one or the other is completely mistaken.

In any event, safety concerns are wholly absent from the letter that Hoepfner sent Satawa on March 9, 2009. There, addressing Satawa's lawyer, Hoepfner wrote:

Dear Mr. Muise:

Please allow this letter to serve as the Board of County Road Commissioners for the County of Macomb's formal denial of the January 7, 2009 Application for Permit submitted by John Satawa to erect a nativity scene in the Mound Road right of way. Given the religious nature of your nativity scene, the Road Commission of Macomb County as a governmental agency must weigh whether or not the approval of such a permit would be deemed a violation of the First Amendment of the United States Constitution.

A statute or practice that touches on religion, if it [is] to be permissible under the establishment of religion clause of the Constitution's First

---

[8]March 6, 2009 was a Friday.

Amendment, (1) must have a secular purpose, (2) must neither advance nor inhibit religion in its principal or primary effect, and (3) must not foster an excessive entanglement of government with religion. In *Allegheny v. ACLU of Pittsburg[h]*, 492 U.S. 573 (1989), the U.S. Supreme Court held that "there is no doubt, of course, that the crèche (nativity scene) itself is capable of communicating a religious message."

Since the nativity scene Mr. Satawa desires to place in the right of way clearly displays a religious message, this would be a violation of the Establishment Clause of the First Amendment: "*Establishment Clause*, at the very least, prohibits government from appearing to take a position on questions of religious belief or from 'making any adherence to a religion relevant in any way to a person's standing in the political community.'" *Allegheny*, at 594.

The Road Commission of Macomb County cannot permit you to display this nativity scene in the Road Commission's right of way. This undoubtedly would be interpreted as our endorsement of religion, in violation of the *Establishment Clause of the U.S. Constitution*.

Thank you for your attention to this matter. Please do not hesitate to contact me with any questions or concerns.

Sincerely,

/s/

Robert P. Hoepfner, P.E.
County Highway Engineer

Satawa filed this lawsuit in the Eastern District of Michigan on October 23, 2009. He claimed that the Board violated his free-speech rights, the Establishment Clause, and the Equal Protection Clause by denying his permit. He sought declaratory and injunctive relief and nominal damages. A Motion for Temporary Restraining Order and Preliminary Injunction soon followed. The district judge, after hearing oral argument and conducting a "lengthy site visit," denied the motion. He first reasoned that, even if the median were a public forum, the state's interest in traffic safety was compelling, and denial of the permit was narrowly tailored to suit that interest because there were other places that Satawa could display the crèche. Thus, the court held, Satawa could not show that he was likely to succeed on the merits, and was not entitled to a temporary restraining order or a preliminary injunction on his free-speech claim. Notably, the district court found that Hoepfner's stated concern about a vehicle striking the crèche

was "purely speculative," and thus not a compelling state interest. Instead, it focused on the possibility, apparently first raised during briefing or argument on the Motion for Temporary Restraining Order and Preliminary Injunction,[9] that the crèche could impede sight lines and, thus, increase the risk of two or more vehicles colliding.

The district court similarly held that Satawa's Establishment Clause claim was not likely to succeed because Satawa could not satisfy the three-part *Lemon* test—the Board's denial had a secular purpose, traffic safety; the policy of forbidding all temporary structures did not endorse, or convey disapproval of, religion; and there was no entanglement. *See Lemon v. Kurtzman*, 403 U.S. 602 (1971).

When it denied Satawa's motion, the district court also ordered the parties to show cause why it should not convert its preliminary order to a final judgment on the merits, pursuant to FED. R. CIV. P. 65(a)(2). Satawa requested the opportunity to develop the factual record further, so that he could challenge the veracity of the Board's asserted safety justification, and press his Establishment Clause and equal-protection claims, which he did not brief in his temporary-restraining-order motion. The court granted the request, discovery opened and closed, and the parties cross-moved for summary judgment.

---

[9] It is not clear when this "additional justification" first appeared. The district court, when discussing the increased risk of vehicles colliding, cited a paragraph from Hoepfner's affidavit, attached to the Board's response to Satawa's Motion for Temporary Restraining Order or Preliminary Injunction, dated October 30, 2009. That paragraph, however, is a general statement, explaining why the Board generally does not allow structures in its rights of way. Board Resp. to Request for Temporary Restraining Order at 33 ("Roadside control is necessary to improve highway safety, to maintain or improve site line distances, expedite the free flow of traffic, safeguard present and future highway investment, conserve abutting property values, and to preserve the attractiveness of the landscape in the right of way."). Neither Hoepfner's affidavit nor the Board's briefing in the district court dealt specifically with an increased risk of vehicles colliding. Rather, both focused on the possibility that a vehicle could strike the crèche itself. *Id.* at 12 ("Certainly the Plaintiff's structure itself, regardless of content, could be struck by a vehicle travelling down Mound Road or in the intersection and cause serious damage not only to a travelling vehicle, but also any passengers in a vehicle."). The closest that the Board came to arguing its sight-obstruction rationale was a citation to the Michigan Road Design Manual in its October 30, 2009 response, suggesting "that a flat, smooth unobstructed area . . . is highly desirable and significantly improves highway safety." But the record contains no explicit mention of the vehicle-on-vehicle-collision justification that the Board now presses until the *district court*, based on its own observations, found that the display could obstruct a driver's line of sight. It made this finding in its order denying Satawa's motion for a preliminary injunction, dated December 28, 2009. Only *after* that order did the parties commission expert reports discussing the possibility that the crèche could obstruct a driver's view. These reports first appear in the parties' summary-judgment submissions, dated July 29, 2010, July 30, 2010, and August 19, 2010.

The district court granted summary judgment for the Board on April 19, 2011. It held, first, that the median was not a public forum, since it was not "a place intended for bringing citizens together to exchange ideas." Thus, the court reasoned, the Board could restrict speech, subject to reasonable and viewpoint-neutral time, place, and manner restrictions. The Board's stated traffic-safety concern satisfied this standard.

The court also believed that, even if the median were considered a traditional public forum, the Board had a compelling interest in promoting traffic safety, and denying the permit was a narrowly tailored means of achieving that goal. This time, the judge had dueling expert reports to consider in reaching his conclusion. The experts first agreed that the crèche posed no enhanced risk to drivers who obeyed the traffic signals. They also agreed, however, that if a driver traveling northbound on Mound Road ran a red light, and another driver traveling eastbound on Chicago Road at six to ten miles-per-hour below the posted speed limit looked for traffic before coming to the crèche, then passed the crèche and continued through the intersection without again checking for traffic, the Chicago Road driver would not be able to see the Mound Road driver's car running the red light, and therefore might not be able to prevent a collision as effectively as he could without the crèche. The district court acknowledged that this possibility was remote, but reasoned that "the potential for even one tragic accident at a busy intersection clearly constitutes a compelling interest which the State must address." The district court also expressed concern that, if the Board had to permit Satawa to install his crèche, it would be required to allow "all kinds of private installations of all shapes and sizes in medians all over Macomb County." The Board's denying Satawa's permit, the district court reasoned, was narrowly tailored because "the Defendants' action in denying Plaintiff a permit to erect his Nativity display in the Mound Road median does not leave Plaintiff without any comparable viable site for his expression."[10]

The district court also granted summary judgment for the Board on Satawa's Establishment Clause and equal-protection claims. The former, it reasoned, failed

---

[10]A number of local businesses offered to display the crèche.

because the government had a valid stated purpose of traffic safety; the primary effect of denying the permit did not convey the message that the government endorsed, or disapproved of, religion; and there was no entanglement. Satawa's equal-protection claim failed because the Board's decision to deny the permit was rationally related to the legitimate government interest of traffic safety. Satawa appeals.

## II

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). We review a district court's grant of summary judgment *de novo*, construing the facts, and drawing all reasonable inferences, in the non-moving party's favor. *ACLU of Ky. v. Mercer Cnty., Ky.*, 432 F.3d 624, 628 (6th Cir. 2005).

## III

Neither the federal government nor the states may "abridg[e] the freedom of speech." U.S. CONST. amend. I; *Stromberg v. California*, 283 U.S. 359, 368 (1931) (formally incorporating Free Speech Clause).[11] This does not mean, however, that anyone may express himself however he wants, wherever he wants, whenever he wants. The government may regulate even constitutionally protected speech, as long as that regulation hinges on a weighty enough government interest, tailored carefully enough to account for the competing values at stake. What "enough" is depends on what the individual wants to express and where he wants to express it, for "the character of every act depends upon the circumstances in which it is done." *Schenck v. United States*, 249 U.S. 47, 52 (1919) (Holmes, J.).

We have reduced these general principles to the three-part test that we apply here. First, we decide whether the First Amendment protects the speech or expression

---

[11]Although "[t]he First Amendment literally forbids the abridgment only of 'speech,' . . . we have long recognized that its protection does not end at the spoken or written word. . . . [C]onduct may be sufficiently imbued with elements of communication to fall within the scope of the First . . . Amendment[]." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). "There is no doubt, of course, that the crèche itself is capable of communicating a [constitutionally protected] religious message." *Cnty. of Allegheny v. ACLU of Pittsburgh*, 492 U.S. 573, 598 (1989).

at issue. Then, we fix the appropriate level of scrutiny by specifying what kind of forum the speaker wants to use. Finally, we determine whether the government's challenged action was constitutional, in light of the standards that apply to the relevant forum. *See Miller v. City of Cincinnati*, 622 F.3d 524, 533 (6th Cir. 2010).

## A

The Board concedes that the crèche is protected religious expression. Appellees' Br. at 27; *see also Allegheny*, 492 U.S. at 598. Our analysis, therefore, begins with the question of how to define the median. The Supreme Court has divided government property into three categories, for forum-analysis purposes. First, property like the "streets and parks which have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions" is considered a traditional public forum. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) (internal quotation marks omitted). In such a forum, the government may prevent expression because of its content only if the government "show[s] that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Ibid.* The government may, however, "enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Ibid.*

Second, "public property which the state has opened for use by the public as a place for expressive activity," is called a designated public forum. *Ibid.* Although the government did not have to create the designated public forum in the first place, and "need not indefinitely retain the open character of the facility," once it opens its doors to some expression, it must treat the designated public forum like a traditional public forum until it closes its doors again. *Id.* at 45–46. Thus, during the time that a designated public forum is open to the public, "[r]easonable time, place and manner regulations are permissible, and a content-based prohibition must be narrowly drawn to effectuate a compelling state interest." *Id.* at 46.

Finally, if a piece of government property "is not by tradition or designation a forum for public communication . . . the state may reserve the forum for its intended purpose." *Ibid.* In such a nonpublic forum, "it is . . . black-letter law that . . . [the government] can exclude speakers on the basis of their subject matter, so long as the distinctions drawn are viewpoint neutral and reasonable in light of the purpose served by the forum." *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 189 (2007).

Determining what kind of forum a particular piece of property is may seem like an exercise in line-drawing, and in a sense it is: we must decide which of the three categories above best describes the Mound Road median so that we can apply the appropriate level of scrutiny to the Board's denial of Satawa's permit. Still, for purposes of the decision-making process, it is perhaps easier to think of a continuum. "At one end of the spectrum" is the prototypical traditional public forum, a public space "immemorially . . . held in trust for the use of the public, and, time out of mind, . . . used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry*, 460 U.S. at 45. Public parks, for instance, fall into this category. At the other end is property that the government owns, has always owned, and does not ordinarily open to the public. In such a forum, "[a]ccess . . . can be restricted as long as the restrictions are reasonable and are not an effort to suppress expression merely because public officials oppose the speaker's view." *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 800 (1985). The inside of a government building, used as office space, would fall in this category. Many, if not most, fora fall somewhere between these extremes. We need not determine precisely where on the spectrum the Mound Road median lies, only which broad category describes it best.

Beyond the general principles of forum analysis discussed above, little persuasive, and no binding, authority guides our analysis.[12] Perhaps the case most

---

[12]Nor can we dispose of the forum-analysis issue with Satawa's suggestion that, because Michigan law defines the median as part of "the street," the Mound Road median is automatically a public forum. Our task is to examine the characteristics of the median, not blindly to follow Michigan's description of a given piece of property. *See Boardly v. U.S. Dep't of Interior*, 615 F.3d 508, 514–15 (D.C. Cir. 2010) (rejecting proposition that, because national parks are called parks, they all automatically qualify as traditional public fora).

similar to ours is *Snowden v. Town of Bay Harbor Islands, Fla.*, 358 F. Supp. 2d 1178 (S.D. Fla. 2004).  There, a woman applied for permission to display a crèche near a menorah on a "grassy area approximately 760 feet long by 140 feet wide, dividing State Road 922." *Id.* at 1184.  The grassy area had "no public parking spaces, no sidewalks, no benches, no bathrooms, and no recreational facilities," just grass.  *Ibid.*  The town refused to consider her application and she sued.  The district court granted her motion for a preliminary injunction, but did not decide what kind of forum the grassy area was, holding instead that, whether the area was a non-public forum, or a designated public forum later closed to private religious speech (the two options that it thought tenable), the standard of review would be the same in the circumstances presented.  *Id.* at 1194. The *Snowden* court ultimately found that Snowden was likely to succeed on her claim that the Town's denying her application was impermissible viewpoint discrimination and thus violated the First Amendment.  *Id.* at 1195–96.

But even if *Snowden* had decided what kind of forum the grassy area was, its reasoning would be only marginally helpful, since there are critical factual differences between the grassy area and the Mound Road median.  Unlike the Mound Road median, the grassy area in *Snowden* had "no sidewalks, no benches . . . and no recreational facilities." *Id.* at 1184.  It made no "apparent invitation to the public[,] [and did] not present the physical characteristics of a park beyond the presence of grass." *Id.* at 1193. Here, by contrast, the Mound Road median contained two park benches and farm equipment.  It was landscaped and housed at least one plaque, which could only be read by someone standing on the median.  The Mound Road median, in other words, has features that invite the public to spend time there.  It is more like a public park and therefore more likely than the median in *Snowden* to qualify as a traditional public forum.

Also relatively unhelpful is *Warren v. Fairfax County*, 196 F.3d 186 (4th Cir. 1999) (en banc).  There, Fairfax County denied Warren's request to build a "holiday display," *id.* at 189, on "a large grassy mall, approximately thirty yards wide and spanning about 200 yards.  Sidewalks circumnavigate[d] the mall and amble[d]

along a central landscaped strip." *Id.* at 188. The mall abutted Fairfax County's government center. *Ibid.* The Fourth Circuit, sitting *en banc*, held that the mall was a traditional public forum, and that the County's denying Warren's permit was not a narrowly tailored means of achieving a compelling state interest. *Id.* at 194–96, 197–98. In *dicta*, the court argued that median strips, because they are part of the street, qualify automatically as traditional public fora. *Id.* at 196–97.

*Warren*, like *Snowden*, is critically different from this case. There, the mall was quite close to the seat of government, and apparently covered by sidewalks. The Mound Road median, unlike the mall in *Fairfax*, is not "a part of the grounds of a seat of legislative and executive power," *id.* at 196, and contains only one small strip of sidewalk. It is, in this sense, less likely to qualify as a traditional public forum than the Fairfax County mall.

Nor is *ACORN v. City of Phoenix*, 798 F.2d 1260 (9th Cir. 1986), *overruled by Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936 (9th Cir. 2011) (en banc), particularly persuasive. In *ACORN*, the City of Phoenix passed an ordinance prohibiting a person from "stand[ing] on a street or highway and solicit[ing], or attempt[ing] to solicit, employment, business or contributions from the occupants of any vehicle." *ACORN*, 798 F.2d at 1262. Although the Ninth Circuit upheld the ordinance, it did not decide whether streets qualified as traditional public fora, even when being used by cars. Rather, it explained: "under the circumstances of this case, we need not decide whether public streets are perpetual public fora. . . . We conclude that the Phoenix ordinance can be justified even under the more rigorous standards applied to the regulation of expression in traditional public fora." *Id.* at 1267.

But, like *Snowden*, the *ACORN* court's reasoning would not have been particularly helpful to us, even if the court had decided what kind of forum was at issue. *ACORN* involved people who actually went into the streets to solicit contributions from drivers stopped in traffic. *Id.* at 1262. This is not remotely similar to our case, where the property at issue is not the street itself, but a landscaped median, with adequate space for pedestrians and sojourners, benches, and historical displays.

To decide what kind of forum the Mound Road median is, then, we return to more general forum-analysis principles. *Perry*, which laid the foundation for today's forum analysis, cited *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939), when explaining what kind of property qualifies as a traditional public forum. *Perry*, 460 U.S. at 45. In *Hague*, the Court reasoned:

> Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens.

*Hague*, 307 U.S. at 515. To determine whether the median is such a place, we examine "the objective characteristics of the property, such as whether, by long tradition or by government fiat, the property has been devoted to assembly and debate." *Ark. Educ. Television Com'n v. Forbes*, 523 U.S. 666, 677 (1998) (internal quotation marks omitted).

The Mound Road median is difficult to define because it has objective characteristics typical of both public and non-public fora. Like a public park, one of the "quintessential public forums," *Perry*, 460 U.S. at 45, the median is landscaped and has benches for people to use. It also contains "memorial trees and brass memorial plaques affixed to rocks." Appellant's Br. at 12. These plaques are discernable only from the median—they are too small to be read by a passing motorist. Across Chicago Road, in a similar median, is the gazebo, erected by the City of Warren Historical Society, which contains more space for people to assemble.

On the other hand, the median is in the middle of a busy eight-lane road, with a fifty-mile-per-hour speed limit. There does not appear to be any special parking area for the median, nor are there dedicated public restrooms. *See Snowden*, 358 F. Supp. 2d at 1193 (noting lack of "appropriate accommodations facilitating such use, such as public restrooms and public parking"). However, there is pedestrian access from a sidewalk that crosses the median and connects the two sides of Mound Road.

On balance, we hold that the Mound Road median is a traditional public forum. Residents of Warren apparently use the median for a variety of expressive purposes, such as the display of farm equipment (meant to show the historical nature of the village) and memorial plaques. The median, moreover, invites visitors. It contains park benches and is accessible by sidewalk. True, the Mound Road median is not next to a seat of government, nor is there any evidence that it is a place where people discuss politics, in particular. But a public space does not implicate the First Amendment only when it is a forum for political discussion. Rather, "streets and parks . . . have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of *assembly*, *communicating thoughts between citizens*, and *discussing public questions*." *Hague*, 307 U.S. at 515 (emphasis added). Nor does the median's location necessarily preclude its being identified as a public forum. A public sidewalk allows access to the median, and public benches populate it.

The district court argued, and the Board argues, for a contrary conclusion. Their claims are not persuasive. The district court "distilled" three factors from the *Snowden* and *Fairfax* decisions:

> (1) the median's physical characteristics and the context of the property's use, including its location and purpose; (2) the County's intent in constructing the median and its need for controlling expressive activities on the property, as evidenced by its policies or regulations; and (3) whether the property in question is part of a class of property which by history or tradition has been open and used for expressive activity.

Applying these three factors, the district court held that, "[v]iewed in its totality, the subject median cannot be a place intended for bringing citizens together to exchange ideas." The median, it reasoned, was not a place "used for public discourse and debate," nor was it "property that . . . Macomb County has dedicated to commemorating the people, ideals, and events that compose the city's or county's identity." Thus, the court held that the median was not a public forum.

This reasoning is problematic. First, the district court's interpretation was too narrow. Without question, property "intended for bringing citizens together to exchange

ideas," "used for public discourse and debate," or "dedicated to commemorating the people, ideals, and events that compose the city's or county's identity" can qualify as a traditional public forum. But to hold that every traditional public forum must display one or more of these particular qualities, as the district court appears to have done, is to misread relevant Supreme Court precedent. A forum is public because it is a place long dedicated, whether by law or tradition, to "assembly, communicating thoughts between citizens, and discussing public questions." *Hague*, 307 U.S. at 515; *see also Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469 (2009) ("This Court long ago recognized that members of the public retain strong free speech rights when they venture into public streets and parks . . . ."); *Capitol Square Review and Advisory Bd. v. Pinette*, 515 U.S. 753, 761 (1995) ("The right to use government property for one's private expression depends upon whether the property has by law or tradition been given the status of a public forum, or rather has been reserved for specific official uses."). The Mound Road median has been a place where people could gather since at least 1991, when the Village of Warren Historical Commission built the gazebo.[13] It is accessible by public sidewalk and features benches and memorial plaques. Perhaps the Mound Road median is not a place where people would ordinarily conduct political discourse. But there is no reason that they could not do so: the median is a public space, which is, and apparently long has been, available to all comers. This is enough. The district court's too-restrictive reading was incorrect.[14]

Neither is the Board's claim that the median is a nonpublic forum persuasive. The Board emphasizes that Mound Road carries "over 82,000 cars a day . . . in 8 lanes of traffic at speeds near or in excess of 50 mph." Appellees' Br. at 33. It claims that it "does not want people sitting in the . . . median," and that "[t]he Mound Road median is certainly not a place where the [Board] would encourage people to congregate or sit."

---

[13]Indeed, to read the Michigan Historic Marker near the gazebo, one would have to be on the median.

[14]Notably, the district court is not entirely right on the facts either. At the gazebo is a historical marker, discussing the Village's history. And sprinkled around the median are plaques, honoring prominent citizens. These facts point to at least some "commemorati[on] of the people, ideals, and events that compose the city's or county's identity."

*Ibid.* The Board also suggests that the gazebo does not counsel a contrary conclusion, since "the display of a permanent monument by a government in a public park is not the form of expression to which the forum analysis applies." *Id.* at 35.

These claims are unsuccessful. First, the record refutes the Board's contention that, because Mound Road is a high-volume roadway, the Board does not want people on the median. If this were so, it would be strange to provide access to the median via sidewalk, and to allow various groups to erect benches, a gazebo, and plaques that could only be read while standing on the median. The Board replies that it did not know about any of these things before this litigation, and that it has now requested (though not compelled) removal of, at least, the farm equipment.[15] Even accepting this as true, though, the character of the median is a matter of tradition. The board's choosing to attempt to close the median to all expression now does not change its traditional status for the purposes of this litigation.

Nor is the Board's claim that the gazebo has no bearing on our forum analysis correct. It is, of course, true that "[t]he Free Speech Clause restricts government regulation of private speech; it does not regulate government speech," *Summum*, 555 U.S. at 467, but the significance of the gazebo is not its message. Rather, the gazebo's presence demonstrates that the median is, like a public park, a place that welcomes visitors.

In sum, the Mound Road median is best categorized as a traditional public forum. To be sure, it is not prototypical. Nevertheless, it is a place where people have long been able to gather, sit, and communicate, even though it separates traffic on a busy street.

B

Because the median is a traditional public forum, the government may prohibit protected expression based on content only if it "show[s] that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end."

---

[15]At oral argument, the Board's attorney indicated that the presence of other objects in the median was still "being hotly discussed and debated between the City and the Road Commission."

*Perry*, 460 U.S. at 45.  It may, however, "enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication."  *Ibid.*

"[U]nder strict scrutiny [the government] still must demonstrate that [its] stated justification is the *actual* purpose for the proposed amendment and not a 'rationalization[ ] for actions in fact differently grounded.'"  *Awad v. Ziriax*, 670 F.3d 1111, 1130 n.15 (10th Cir. 2012) (final alteration in original.) (quoting *United States v. Virginia*, 518 U.S. 515, 535–36 (1996));[16] *see also Shaw v. Hunt*, 517 U.S. 899, 908 n.4 (1996) ("To be a compelling interest, the State must show that the alleged objective was the legislature's 'actual purpose . . . .'") (citing *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 730 (1982)).  This is different from rational-basis review, *see, e.g.*, *Williamson v. Lee Optical of Okla.*, 348 U.S. 483 (1955) (proposing hypothetical justifications for Oklahoma law, and affirming based on those justifications), but it is crucial because of what is at stake.  "We cannot and will not uphold [government action] that abridges an enumerated constitutional right on the basis of a factitious governmental interest found nowhere but in the defendants' litigating papers."  *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1268 (10th Cir. 2008) (McConnell, J.).

The parties first dispute whether religion or traffic safety was the "real" reason that the Board denied Satawa's permit application.  The district court held that, as the defendants' litigating papers, suggested, safety was at least part of the Board's motivation for denying the permit.  ("In sum, the Court does not find that Plaintiff has demonstrated the existence of any material issue of fact with regard to Defendants' safety reasons for the denial of Mr. Satawa's permit application such that the safety reasons given by Mr. Hoepfner should be discredited.").  The district court erred.

Before this lawsuit, there was no indication that safety concerns played *any* role in the Board's decision.  Quite the contrary.  Even though Satawa's permit application

---

[16]*Virginia*, which *Awad* cited, involved intermediate scrutiny, the less exacting review applied to gender discrimination.

specifically claimed that the crèche did not obstruct traffic or pose "any other safety concerns," Hoepfner's letter denying the permit only addressed religion. ("The Road Commission of Macomb County cannot permit you to display this nativity scene in the Road Commission's right of way. This undoubtedly would be interpreted as our endorsement of religion, in violation of the *Establishment Clause of the U.S. Constitution*."). Not once did he use the word "safety;" not once did he use the word "traffic." Likewise, Hoepfner's presentation to the Board made no mention of safety concerns. Rather, he explained: "I've contacted Ben Aloia and asked him to research [whether the Board should grant Satawa's application]. Ben has informed me that we should not allow this nativity scene to be installed, and he has given me some language that I should [sic] respond to this permit. I intend to do that." Ben Aloia is a lawyer,[17] not a traffic engineer. Never did Hoepfner take any measurements, do any calculations, or consult with any other engineers before denying the permit. If Hoepfner's concern really were traffic safety, it is implausible that there would be no mention of traffic safety in either his letter to Satawa or his presentation to the Board. Hoepfner's dealing only with religious concerns in documented letters and discussions before litigation began strongly suggests that the Establishment Clause, not safety, was the reason for his decision. This is especially so at the summary-judgment stage, where we must construe the record in Satawa's favor.

Contrary evidence in the record is, at best, thin. As discussed above, Hoepfner claimed in his deposition that he had separate discussions with each of the Road Commissioners about Satawa's application, outside of the Board's regularly scheduled meetings. ("Q: Did you ever have any discussions with any Board member outside of the Board meetings regarding the nativity scene permit? A: All of the Board Members."). He insisted that these discussions lasted "many, many hours," and focused on his belief that the crèche posed a traffic hazard. Board Chairwoman Fran Gillett testified that she understood that Hoepfner was concerned about safety. But she also indicated that she "first became aware of [the crèche] . . . when [the Board] had a

---

[17]Indeed, Attorney Aloia continues to represent the Board before us.

complaint the Christmas before last [December 2008], and then at that point [she] *didn't hear anything more until 2009* at [the March 6 Board] meeting." (emphasis added). One business day after the board meeting, Hoepfner sent a letter denying the permit to Satawa's lawyer.

This sequence of events casts doubt on the Board's argument that Hoepfner related his safety concerns to Gillett through casual, passing discussions that took "many, many hours." This would be so even if we were not required to construe the facts and draw all reasonable inferences in Satawa's favor. *Mercer Cnty.*, 432 F.3d at 628. Under the summary-judgment standard, the district court should have rejected Hoepfner's claim that he discussed safety concerns with Board members before the meeting, and drawn the reasonable inference that the Board's self-serving (but still questionable) litigation documents were designed to conceal its real reason for denying the permit: the crèche's religious content.[18]

Because, at this stage, we must assume that the Board rejected the permit application based on its religious content, strict scrutiny applies.[19] *Pinette*, 515 U.S. at 760 ("Our precedent establishes that private religious speech, far from being a First Amendment orphan, is as fully protected under the Free Speech Clause as secular private expression."). Thus, the government must show that its denying the permit application was "necessary to serve a compelling state interest and that it [was] narrowly drawn to achieve that end." *Perry*, 460 U.S. at 45.

---

[18]It is also worth noting that, here, the Board presses a safety concern that Hoepfner admits he did not have. In his deposition, Hoepfner expressly stated that he "didn't deny [the permit] for sight problems." The safety issue relating to sight (obscured vision) that the Board now claims is compelling appeared, at the earliest, during briefing on Satawa's temporary-injunction motion. *Supra* note 9. We may consider this shift in determining whether the Board's denying the permit was constitutional. *McCreary Cnty., Ky. v. ACLU of Ky.*, 545 U.S. 844, 866 (2005) (holding that, when determining purpose in the Establishment Clause context, past behavior was relevant, since "the world is not made brand new every morning").

[19]Amicus National Legal Foundation suggests that we adopt a framework similar to the *McDonnell Douglas* burden-shifting analysis to determine whether a government's asserted motivation is its actual motivation. Amicus Br. of Nat'l Legal Found. at 2–7. We need not take this step because, at this stage, resolution of the actual-motive question is straightforward.

"There is no doubt that compliance with the Establishment Clause is a state interest sufficiently compelling to justify content-based restrictions on speech. Whether that interest is implicated here, however, is a different question." *Pinette*, 515 U.S. at 761–62 (citing *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394–95 (1993)). For the Establishment Clause to serve as a compelling state interest, the speech suppressed must actually violate the Constitution. If the government's "posited fears of an Establishment Clause violation are unfounded," an Establishment Clause defense will not do. *Lamb's Chapel*, 508 U.S. at 395.

The question we face, then, is whether Satawa's private expression of religious beliefs on the Mound Road median would violate the Establishment Clause. "And we do not write on a blank slate in answering it." *Pinette*, 515 U.S. at 762. Time and again, the Supreme Court and this court have considered cases where a private individual seeks to express religious views in a public forum. *See, e.g.*, *Pinette*, 515 U.S. at 761–63 (holding that allowing KKK to erect unattended cross on Columbus's Capitol Square would not violate Establishment Clause); *Lamb's Chapel*, 508 U.S. at 395 (holding that use of school facilities during off-hours for religious film would not violate establishment clause); *Widmar v. Vincent*, 454 U.S. 263, 271–76 (1981) (holding that University's allowing religious student groups to use school facilities would not violate Establishment Clause); *Chabad of S. Ohio & Congregation Lubavitch v. City of Cinncinati*, 363 F.3d 427 (6th Cir. 2004) (affirming grant of preliminary injunction against City of Cincinnati's enforcing ordinance prohibiting display of menorah in traditional public forum during Chanukah); *Ams. United for Separation of Church & State v. City of Grand Rapids*, 980 F.2d 1538 (6th Cir. 1992) (en banc) (holding that privately funded menorah, displayed during Chanukah in traditional public forum did not violate Establishment Clause); *Congregation Lubavitch v. City of Cincinnati*, 923 F.2d 458 (6th Cir. 1991) (holding that city could not show likelihood on success of merits in challenge of injunction requiring it to keep menorah displayed in public square lit). Where, as here, "[t]he State did not sponsor [the religious] expression, the expression was made on government property that had been opened to the public for speech, and permission was requested through the same application process and on the

same terms required of other private groups," the government would not violate the Establishment Clause by granting the permit. *Pinette*, 515 U.S. at 763. The Board's interest in preventing an Establishment Clause violation, therefore, was not compelling. Its decision to deny the permit does not pass muster under strict scrutiny.

C

We would reach the same result even if we accepted the Board's proffered traffic-safety justification. To deny the permit based on traffic safety, the Board would have to show that it did no more than enforce compliance with a reasonable, content-neutral time, place, and manner restriction, "narrowly tailored to serve a significant government interest, [which left] open ample alternative channels of communication." *Perry*, 460 U.S. at 45; *Bays v. City of Fairborn*, 668 F.3d 814, 822 (6th Cir. 2012) ("To be a constitutional time, place, and manner restriction [on protected expression in a traditional public forum], the . . . policy must be narrowly tailored to serve a significant government interest."). Of course, traffic safety in general is a significant government interest. The particular concern that the board posits in this case, however, is not. The parties' experts agreed that the crèche could cause an accident in only one scenario: a driver traveling northbound on Mound Road runs a red light, and another driver traveling six to ten miles-per-hour below the posted speed limit, eastbound on Chicago Road, looks for traffic before coming to the crèche, then passes the crèche and continues through the intersection without again checking for traffic. Not only is this scenario extremely improbable—indeed, it rests on one driver flagrantly disobeying traffic laws, while another is grossly inattentive—but the crèche's absence would do little to prevent it. For the crèche to cause the posited collision to take place, the Chicago Road driver would have not to look at Mound Road traffic after he passed the area that houses the crèche, and not have his view obstructed by the pine trees (though the County claims that the trees permit a view of Mound Road). Otherwise, the driver would have ample time to stop, regardless of the crèche's presence. A hypothetical traffic-safety concern resting on aberrant behavior, which has never happened—nor has there been any record of it being threatened—in sixty years does not qualify as a significant government interest.

Nor, as the Amicus urges, was the decision to deny the permit outright a means narrowly enough tailored to achieve the Board's stated traffic-safety goal. "Although a regulation may satisfy the [narrow-]tailoring requirement even though it is not the least restrictive or least intrusive means of serving the state's goal, it must not be substantially broader than necessary." *Bays*, 668 F.3d 823 (internal quotation marks omitted). Here, the Board denied Satawa's permit outright. It made no effort to take a less restrictive course, nor did it explain why it could not have worked with Satawa to allay its safety concerns. It did not tailor its denial at all, much less narrowly, to its stated interest.

Denial of the permit, therefore, would not pass muster even if we accepted the general validity of the Board's proffered traffic-safety justification.

IV

The First Amendment's Establishment Clause prohibits the government from taking action "respecting an establishment of religion." U.S. CONST. amend. I. This, the Supreme Court has explained, means that the government may neither officially promote religion, nor harbor "an official purpose to disapprove of a particular religion or of religion in general." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993). "The touchstone for our analysis is the principle that the First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion." *McCreary Cnty.*, 545 U.S. at 860 (internal quotation marks omitted).

Although it has lost some of its luster, the test from *Lemon*, 403 U.S. 602, as refined by later Supreme Court opinions, guides our Establishment Clause analysis. *ACLU of Ohio Found., Inc. v. DeWeese*, 633 F.3d 424, 430–41 (6th Cir. 2011). Under today's *Lemon* test, we ask: (1) whether the government's predominant purpose was secular;[20] (2) "whether the government action has the purpose or effect of endorsing religion," *ibid.*, and (3) whether the action fosters "an excessive entanglement with

---

[20]Originally, the first question in the *Lemon* test was whether the challenged action had "a secular . . . purpose." *Lemon*, 403 U.S. at 612. *McCreary County* reformulated this test, requiring that the government show that its predominant purpose was secular. *Mercer Cnty.*, 432 F.3d at 635.

religion." *Lemon*, 403 U.S. at 613.  If we cannot answer "yes" to the first question and "no" to the second two, the challenged action violates the Establishment Clause. *DeWeese*, 633 F.3d at 431 ("Failure under any of *Lemon*'s three prongs deems governmental action violative of the Establishment Clause." (internal quotation marks omitted)).

In the predominant-purpose inquiry, we generally accept the government's stated rationale for its action.  *Ibid.*  "But it is nonetheless the duty of the courts to distinguish a sham secular purpose from a sincere one."  *Santa Fe Ind. Sch. Dist. v. Doe*, 530 U.S. 290, 308 (2000) (internal quotation marks and alterations omitted).  Our task is to examine the record with "eyes that . . . belong to an objective observer, one who takes account of the traditional external signs that show up in the text, . . . history, and implementation of the statute, or comparable official act," *McCreary Cnty.*, 545 U.S. at 862 (internal citations and quotation marks omitted), and to ensure that "the secular purpose required [was] genuine, not a sham, and not merely secondary to a religious objective."  *Id.* at 864 (citing *Santa Fe*, 530 U.S. at 308).  Of course, "reasonable observers have reasonable memories, and our precedents sensibly forbid an observer to turn a blind eye to the context in which [the] policy arose."  *Id.* at 866 (alteration in original, internal quotation marks omitted).

Here, as discussed above, an objective examination of the record—especially at the summary-judgment stage—strongly suggests that the Board denied Satawa's permit because it believed that the crèche, if placed on the median, would violate the Establishment Clause.  Its later-asserted position that it denied the permit because of safety concerns does not withstand even cursory scrutiny.  First, Gillet's testimony casts doubt on Hoepfner's claim that he had extensive discussions with Board members about the safety concerns that the crèche posed.  *See supra* note 9.  Second, the Board's asserted safety justification, like the County's explanation for its display in *McCreary County*, changed over time.  *See McCreary Cnty.*, 545 U.S. at  851–58.  In his deposition, Hoepfner specified: "I didn't deny [Satawa's permit] for sight problems.  It was an encroachment within the right-of-way . . . that's the reason I denied it."  The

Board, however, now relies on the admittedly later-conceived explanation that the crèche could interfere with a driver's line of sight. This shift too casts doubt on the Board's safety explanation. Third, no contemporaneous document gives any reason other than the crèche's religious content for denying Satawa's permit application. Avoiding an Establishment Clause violation, an objective observer would find, was the reason that the Board denied the permit.

Satawa reasons that this premise leads inexorably to the conclusion that the Board's predominant purpose was not secular, but religious. To deny the permit because of the crèche's religious message, he claims, was to express an official policy disfavoring religion. This argument has some intuitive appeal. But it rests on a sleight of hand. The purpose of adhering to the Constitution has nothing to do with religion. The Board's bad guess—or bad legal advice—about the constitutional implications of Satawa's permit, without more, does not show a purpose to favor or disfavor religion.[21] *See Stratechuk v. Bd. of Educ., S. Orange-Maplewood Sch. Dist.*, 587 F.3d 597, 604–06 (3d Cir. 2009). Nor is there any evidence of animosity toward religion in the record.[22] To the contrary, Gillet instructed Hoepfner, who had sought legal advice from outside counsel, to "obey the law." Appellant's Br. at 14. The Board's predominant purpose was the secular purpose of acting constitutionally.[23]

---

[21] A contrary conclusion would put any government faced with a permit application in an impossible position. If it approved the permit, it would be liable for favoring religion; if it denied the permit, it would be liable for disfavoring religion.

[22] Were there such evidence, the result might be different. If the county had a bad motive, or wanted to curry political favor with a particular group, the predominant purpose might not be considered secular.

[23] This reasoning is completely consistent with our earlier strict-scrutiny discussion. Taken objectively, and construed under the summary-judgment standard, the record shows that the Board denied Satawa's permit to avoid what it believed was an Establishment Clause violation. For this to qualify as a compelling state interest, strong enough to justify abridging Satawa's fundamental right to express himself in a traditional public forum, Satawa's display would actually have to violate the Establishment Clause. *Lamb's Chapel*, 508 U.S. at 395. In the first step of the *Lemon* test, something different is at stake. The question is not whether the government put forward a compelling interest that justifies its banning expression, but whether the purpose for a given act was predominantly religious. That the goal of avoiding an Establishment Clause violation is a compelling governmental objective only when there would actually be a constitutional violation has no bearing on whether the effort, right or wrong, to avoid an Establishment Clause violation is a predominantly religious or secular purpose.

Nor, by the same token, would a reasonable observer find that the Board's action had the purpose or effect of endorsing or disapproving of religion, or that denying the permit created any kind of entanglement. Rather, on this record, a reasonable observer would take Hoepfner at his written, and spoken (at the board meeting), word: he was trying to obey the law. Fear of violating the Constitution, not Satawa's religion, motivated his decision. Nothing about that fear suggests any view about, or involvement with, religion at all, short of a desire simply to act lawfully. The district court was correct to grant summary judgment for the Board on Satawa's Establishment Clause claim.

V

The Equal Protection Clause of the Fourteenth Amendment "protects against invidious discrimination among similarly situated individuals or implicating fundamental rights." *Miller*, 622 F.3d at 538 (quoting *Scarbrough v. Morgan Cnty. Bd. of Ed.*, 470 F.3d 250, 260 (6th Cir. 2006)). "[U]nder the Equal Protection Clause . . . government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 96 (1972).

"The threshold element of an equal protection claim is disparate treatment; once disparate treatment is shown, the equal protection analysis to be applied is determined by the classification used by the government decision-makers." *Miller*, 622 F.3d at 538 (quoting *Scarbrough*, 470 F.3d at 260). The Board claims that it granted a permit for only one item on median: the gazebo across the street from the crèche. Appellees' Br. at 49. It suggests, however, that its granting such a license is irrelevant because "[p]ermanent monuments displayed on public property typically represent government speech." *Summum*, 555 U.S. at 470.

The thrust of the Board's claim appears to be that, because the decision to allow the Warren Historical Commission to build a *permanent* monument is government speech, it is not similar to the Board's decision to deny Satawa's application to erect a *temporary* display, for purposes of the Equal Protection Clause. Whether this argument

succeeds is a close question. Without doubt, a permanent display has a different position under the First Amendment than a temporary display. So, in that sense, the gazebo and the crèche are materially different. On the other hand, it would be strange to hold that Satawa's permit application can be denied *because* a restriction on a temporary display is *more* problematic than a restriction on a permanent one. Nevertheless, the two displays are not in the same class, in at least one sense.

We need not resolve this question, however, because of the presence of other objects on the median. As soon as the Board received the Freedom From Religion Foundation's letter, Hoepfner sent an inspector to see the crèche. He immediately called Satawa and told him to remove the display. The record does not show that he took similar steps for the other items on the median until after litigation began. *See* Appellees' Br. at 49 ("[N]one of the other items placed on the median at issue . . . have been permitted by the RCMC. . . . There are discussions underway at the RCMC regarding the removal of these items and the Warren Historical Commission has been approached to remove the items.").

The crèche, as discussed above, is private religious expression, "fully protected under the Free Speech Clause." *Pinette*, 515 U.S. at 760. For the County to have treated it differently than other items on the median, therefore, the decision to ban the crèche would have to advance a compelling governmental interest and be a narrowly tailored means to achieve that interest. *Barr v. Lafon*, 538 F.3d 554, 576 (6th Cir. 2008) ("[W]e apply strict scrutiny under the Equal Protection Clause to a statute infringing on speech protected by the First Amendment . . . ."). As discussed above, the Board cannot meet this standard. *See supra* part III.B. The district court erred by granting summary judgment to the Board on Satawa's equal-protection claim.

VI

In sum, we AFFIRM the district court's grant of summary judgment to the Board on Satawa's Establishment Clause claim. However, we REVERSE the district court's disposition of Satawa's free-speech and equal-protection claims, and remand for further proceedings consistent with this opinion.